[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 08, 2003
THOMAS K. KAHN
CLERK

No. 00-11000

D. C. Docket Nos. 98-00456 CIV-FTM-22D
and 99-00007-CIV-FTM-22D

LARRY NORMAN WADDELL, as Personal
Representative of the Estate of Kristina
Waddell, and in his individual capacity,

Plaintiff-Appellant,

versus

ERIK S. HEMERSON, GARY
LEONARD WHEELER, JR.,

Consolidated
Plaintiffs-Appellants,

versus

THE HENDRY COUNTY SHERIFF'S
OFFICE, RONNIE LEE, in his individual
and official capacity as Sheriff of Hendry
County, Florida, SUSAN SIBBALD, in her
individual capacity,

Consolidated
Defendants-Appellees.

_____

No. 01-16032

_____

D. C. Docket Nos. 98-00456-CV-FTM-29
and 99-00007-CV-FTM

LARRY NORMAN WADDELL, as Personal
Representative of the Estate of Kristina
Waddell, and in his individual capacity,

Plaintiff-Appellant,

ERIK S. HEMERSON, GARY
LEONARD WHEELER, JR.,

Consolidated
Plaintiffs-Appellants,

versus

THE HENDRY COUNTY SHERIFF'S
OFFICE, RONNIE LEE, in his official
capacity as Sheriff of Hendry County,
Florida and in his individual capacity,
SUSAN SIBBALD, in her individual capacity,

Defendants-Appellees.

_____

Appeals from the United States District Court
for the Middle District of Florida

_____

**(May 8, 2003)**

2

Before EDMONDSON, Chief Judge, CARNES and SILER*, Circuit Judges.

EDMONDSON, Chief Judge:

In this consolidated appeal, Larry Waddell, as personal representative of Kristina Waddell's estate, Erik Hemerson, and Gary Wheeler ("Plaintiffs") appeal the district court's grant of summary judgment to Hendry County Sheriff's Office, Sheriff Ronnie Lee, Jr., and Lieutenant Susan Sibbald ("Defendants") in an action pursuant to 42 U.S.C. § 1983. Plaintiffs also appeal the district court's denial of their motion for relief from judgment. No reversible error has been shown; we affirm.

## BACKGROUND

In October 1997, Terry Garnto, a longtime resident of Clewiston, Florida, was convicted of battery. In November 1997, Garnto was sentenced to 364 days' imprisonment, reduced by 29-days' credit for time served in the Hendry County Jail. While serving his sentence as a "trusty" in the Hendry County Jail, Garnto spoke with Sheriff Lee of the Hendry County Sheriff's Office ("HCSO") about

---

*Honorable Eugene E. Siler, Jr., United States Circuit Judge for the Sixth Circuit, sitting by designation.

becoming a confidential informant on the illegal drug trade in Hendry County. After Sheriff Lee spoke with Garnto, the matter was turned over to HCSO Captain John Vetter and narcotics investigators Richard Notaro and Grady Johnson, Jr. When Officer Notaro learned of Garnto's extensive criminal record[1], Officer Notaro expressed concern about using Garnto as a confidential informant. Captain Vetter, however, reasoned that Garnto's record was no worse than that of confidential informants used in federal criminal prosecutions and approved use of Garnto as a confidential informant.

In February 1998, Garnto was enrolled as a confidential informant. That same day HCSO's jail administrator, Lieutenant Sibbald, released Garnto from jail under a "work release" agreement. Under the agreement, Garnto worked at the HCSO's Clewiston substation by day and stayed with his mother at night. Pursuant to the work release agreement, Garnto signed a document promising to consume no drugs or alcohol. Lieutenant Sibbald maintains that she did not know Garnto was to be used as a confidential informant for HCSO.

Five days after his release, in the early morning hours of 8 February 1998, a police officer found Garnto wandering around Clewiston. Garnto was intoxicated.

---

[1] Garnto had been arrested 41 times and had about 19 convictions including robbery, burglary, escape, and battery. Garnto's driving record also reflected that he had been arrested and convicted for driving under the influence and reckless driving.

Upon discovering that Garnto, in Palm Beach County, had an outstanding warrant[2] for failure to appear on a charge of attempting to obtain a controlled substance by fraud, the officer arrested Garnto. Garnto later was transferred to a jail in Palm Beach County.

On 25 February 1998, Lieutenant Sibbald wrote to the Palm Beach County State Attorney's Office. She requested that Garnto, if convicted in Palm Beach County, be returned to Hendry County to serve his sentence. Lieutenant Sibbald wrote that Garnto was "working with us on several projects" and indicated that Garnto would be incarcerated at the Hendry County Jail. On 2 April 1998, Garnto was sentenced to one-year imprisonment on the Palm Beach County charge. The judge recommended that Garnto be allowed to serve his sentence in Hendry County.

On 19 April 1998, Garnto was returned to Hendry County and immediately was returned to work-release status. Garnto continued to make controlled drug purchases for HCSO. One of the alleged drug traffickers HCSO had targeted was Jesus Sanchez. Because HCSO had limited funds with which to conduct its drug

---

[2] Although Hendry County officers, including Lieutenant Sibbald, contend that they had no knowledge of this outstanding warrant, evidence exists that Garnto had filed a request in jail to see a lawyer about an outstanding warrant in Palm Beach County.

operations, Officer Notaro contacted Dennis Eads, a Federal DEA agent, to see if the DEA was interested in using Garnto to purchase drugs from Sanchez.

After observing Garnto act in his confidential informant capacity, Agent Eads had Garnto sign an agreement to work with the DEA as a confidential informant. Under the supervision of Agent Eads, Garnto purchased drugs from Marcus Dennis, an associate of Sanchez. After the DEA signed Garnto as a confidential informant, HCSO assisted the DEA by providing equipment and personnel to perform controlled drug purchases. Officer Notaro informed Garnto, however, that, if Garnto had information pertaining to Sanchez or Dennis, Garnto needed to call Agent Eads. HCSO continued to use Garnto for controlled drug purchases with other suspected drug dealers.

Garnto sought to introduce Agent Eads -- in an undercover capacity -- to Dennis so that Agent Eads could purchase cocaine from Dennis. At a debriefing on 3 July 1998, Garnto told Agent Eads that Garnto was planning to spend the Fourth of July weekend with Dennis at Fort Myers Beach in neighboring Lee County and that it might be possible to arrange a meeting between Agent Eads and Dennis at that time. Agent Eads told Garnto to page him if Dennis wished to meet. Agent Eads also asked Officer Notaro if he would be available to attend the possible

meeting between Agent Eads and Dennis. Officer Notaro indicated he would be available but stated that he had to check with his supervisor.

On 4 July, Garnto went to Fort Myers Beach with Dennis, Mary Harper and another woman. On 5 July, Garnto consumed substantial quantities of alcohol. Upon leaving the beach, Garnto drove away in Harper's car. Garnto later claimed that Sanchez began following him and that Garnto was on his way to page Agent Eads for instructions when Garnto lost control of the car. Gantro crossed into the oncoming lane of traffic and ran into a vehicle occupied by Erik Hemerson, Gary Wheeler, and Kristina Waddell. Waddell died as a result of the injuries she sustained in the collision, and Hemerson and Wheeler suffered serious injuries. On 7 July 1998, HCSO terminated its confidential informant contract with Garnto.

Plaintiffs filed against Defendants three separate complaints which were consolidated by the district court. Plaintiffs alleged that HCSO and Sheriff Lee, in his official capacity, had violated Plaintiffs' substantive due process rights by unlawfully releasing Garnto, making him a paid agent, and failing to monitor him. Plaintiffs further alleged that HCSO, through its agents Sheriff Lee and Lieutenant Sibbald, had acted with willful and wanton disregard for the safety of the public and with willful indifference to Plaintiffs' rights. Plaintiffs also brought claims against Sheriff Lee and Lieutenant Sibbald in their individual capacities, alleging

that they acted with gross negligence and deliberate indifference to foreseeable damage.[3]

The district court granted Defendants' motion for summary judgment. The district court concluded that (1) no reasonable jury could find that Garnto was a state actor for the Defendants at the time of the traffic collision, (2) that Defendants' conduct did not meet the conscience-shocking standard necessary to constitute a substantive due process violation, and (3) that, even assuming Defendants' behavior was wrongful in a constitutional sense, this conduct was not the legal cause of the accident. The district court also determined that it would be an unwarranted and impermissible extension of substantive due process to hold Defendants responsible for the losses caused by the incident. Plaintiffs appealed.

While Appeal No. 00-11000 was before this Court, Plaintiffs filed a motion to expand the record on appeal to include Garnto's testimony at his subsequent trial on the criminal charges resulting from the accident. We denied the motion, but granted Plaintiffs a stay to allow them to seek relief from the district court pursuant to Fed.R.Civ.P. 60(b). In the district court, Plaintiffs filed their motion for relief

---

[3] In their third count, Plaintiffs raised state-law tort claims. The district court declined to exercise pendent jurisdiction over these claims and dismissed them without prejudice. Plaintiffs do not appeal this dismissal.

from judgment under Rule 60(b) based upon newly discovered evidence and fraud by Defendants. The district court denied the motion. Plaintiffs appeal.

DISCUSSION

Appeal No. 00-11000

Plaintiffs contend that Defendants engaged in a deliberate course of misconduct to ensure Garnto's freedom and that the collision in this case was foreseeable in the light of Garnto's criminal record, his propensity for irresponsible intoxication, his being sent to a beach party with drug dealers, and his lack of supervision. Plaintiffs argue that Garnto was an agent for HCSO and that the district court erred by concluding that Garnto's "independent act" of drinking and driving insulated Defendants from their misconduct.[4]

We review a district court's decision to grant summary judgment de novo, viewing the evidence and all reasonable inferences in the light most favorable to

---

[4] Plaintiffs imply that Garnto's contract as a confidential informant provided him with the use of a car. This view is incorrect. The record reflects that the reference to a motor vehicle in the confidential informant records kept by HCSO simply refers to cars owned or used by the confidential informant. The 1982 Ford LTD involved in the collision was owned by a friend of Garnto.

the nonmoving party. <u>Chapman v. AI Transport</u>, 229 F.3d 1012, 1023 (11th Cir. 2000). Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted, "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

We must take seriously the Supreme Court's caution against expanding the concept of substantive due process. <u>See</u> <u>Collins v. City of Harker Heights</u>, 112 S.Ct. 1061, 1068 (1992) ("[T]he [Supreme] Court has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended. The doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field.") (internal citation omitted).

"The Due Process Clause was intended to prevent government officials from abusing their power, or employing it as an instrument of oppression." <u>County of Sacramento v. Lewis</u>, 118 S.Ct. 1708, 1716 (1998) (internal quotations and citations omitted). The substantive component of the Due Process Clause "protects individual liberty against 'certain government actions regardless of the fairness of the procedures used to implement them.'" <u>Collins</u>, 112 S.Ct. at 1068 (quoting

10

Daniels v. Williams, 106 S.Ct. 662, 665 (1986)).  But the Fourteenth Amendment must not be used through section 1983 as a "font of tort law" to convert state tort claims into federal causes of action.  See Neal ex rel. Neal v. Fulton County Bd. of Educ., 229 F.3d 1069, 1074 (11th Cir. 2000).  "Nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security." DeShaney v. Winnebago County Dep't of Soc. Servs., 109 S.Ct. 998, 1002-07 (1989).

For a while, this Court had concluded that state and local government entities could be held liable for substantive due process violations for their failure to protect victims from harm caused by third parties where the state, through its affirmative acts, put the victim in "special danger" of harm.  See Cornelius v. Town of Highland Lake, 880 F.2d 348 (11th Cir. 1989).  In White v. Lemacks, 183 F.3d 1253, 1257-59 (11th Cir. 1999), we concluded, however, that the "special relationship" and "special danger" doctrines were superceded by the standard employed by the Supreme Court in Collins, 112 S.Ct. 1061.  Thus, conduct by a government actor will rise to the level of a substantive due process violation only if

the act can be characterized as arbitrary or conscience shocking in a constitutional sense. See Collins, 112 S.Ct. at 1070.

The Supreme Court has acknowledged that "the measure of what is conscience-shocking is no calibrated yard stick." Lewis, 118 S. Ct. at 1717. We know for certain, however, that a showing of negligence is insufficient to make out a constitutional due process claim. Lewis, 118 S. Ct. 1708, 1718 (1998). And even intentional wrongs seldom violate the Due Process Clause. Acts "intended to injure in some way unjustifiable by any government interest" are "most likely to rise to the conscience-shocking level." Id. But, even conduct by a government actor that would amount to an intentional tort under state law will rise to the level of a substantive due process violation only if it also "shocks the conscience." Dacosta v. Nwachukwa, 304 F.3d 1045, 1948 (11th Cir. 2002).

"[O]nly the most egregious official conduct can be said to be arbitrary in the constitutional sense." Lewis, 118 S. Ct. at 1716 (1998)(quotation and citation omitted). Determinations of what is egregious conduct must not be made in the glow of hindsight; decisions made by a government actor must be egregious --that is, shock the conscience -- at the time the government actor made the decision. See e.g. DeShaney, 109 S.Ct. at 1006-06 (noting that, because State had no constitutional duty to protect child against his father's violence, its failure to do

12

so--though calamitous in hindsight--did not constitute a violation of the Due Process Clause); see also Rodriguez v. Farrell, 280 F.3d 1341, 1352-53 (11th Cir. 2002) (concluding that hindsight could not be used to judge police officer's act of handcuffing suspect, but rather it was necessary to consider what the police officer knew or reasonably should have known at the time of the act).

In some cases, a state official's deliberate indifference will establish a substantive due process violation. But, "[d]eliberate indifference that shocks in one environment may not be so patently egregious in another, and [the] concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking." Lewis, 118 S.Ct. at 1718-19. In this non-custodial setting, a substantive due process violation would, at the very least, require a showing of deliberate indifference to an extremely great risk of serious injury to someone in Plaintiffs' position.[5] See McClendon v. City of Columbia, 305 F.3d 314, 326 (5th Cir. 2002) (stating that Plaintiff was required to demonstrate that "the defendant

_____

[5] We stress the phrase "at the very least." We do not rule out today that the correct legal threshold for substantive due process liability in a case like this one is actually far higher. For example, the standard could be that the government official acted with "deliberate indifference to a substantial certainty of serious injury" or maybe that the government official acted "maliciously and sadistically for the very purpose of creating a serious injury" or perhaps some different standard. We feel comfortable today that the standard we use today is the low point -- may well be too low a point -- for a possible standard in a case like this one and that we can decide this case without being more definite about the law as an academic matter.

13

state official <u>at a minimum</u> acted with deliberate indifference toward the plaintiff"); <u>see</u> <u>also</u> <u>Nix v. Franklin County School Dist.</u>, 311 F.3d 1373, 1376 (11th Cir. 2002) (concluding that deliberate indifference was insufficient to constitute a due-process violation in a non-custodial school setting). We conclude that this record will not allow a finding of such indifference.

To act with deliberate indifference, a state actor must know of and disregard an excessive -- that is, an extremely great -- risk to the victim's health or safety. See <u>McClendon</u>, 305 F.3d at 326 n.8; <u>see</u> <u>also</u> <u>Johnson v. Dallas Indep. School Dist.</u>, 38 F.3d 198, 202 (5th Cir. 1994). We examine in turn each of Defendants' acts.

A.    <u>The release of Garnto from jail</u>

We first consider Defendants' release of Garnto from jail before the termination of his sentence. Despite Garnto's extensive criminal history and an outstanding warrant in Palm Beach County, Defendants released Garnto from jail on "work-release." In addition, when Garnto was later arrested based upon a failure to appear warrant in Palm Beach County, Defendants again released Garnto after misleading Palm Beach County authorities to believe that Garnto would serve

14

his sentence in that case concurrently with his pending sentence at the Hendry County Jail.[6] Although Hendry County officials argued that Garnto completed his sentences on the Hendry County and Palm Beach County convictions on 26 May 1998, it appears that HCSO gave Garnto improper good/gain time credit and disregarded the manner in which the concurrent sentences were to be served.

One might find fault in Defendants' behavior. But no substantive due process right exists to be protected generally from the release from confinement of persons convicted of crimes -- even if the release violates state law. See Lovins v. Lee, 53 F.3d 1208, 1209 (11th Cir. 1995). Furthermore, the record does not reflect Defendants knew about and disregarded an extremely great risk that Garnto would drive while intoxicated and cause a fatal car collision. Although Garnto previously had been convicted of driving while intoxicated, these offenses had occurred ten years earlier. The lapse of time and Garnto's maturing for a decade count in Defendants' favor. Moreover, although Garnto violated the terms of his release by wandering around Clewiston at night while intoxicated, he was not driving.

We cannot say that Defendants, at the time of Garnto's release, were on notice that Garnto would very, very probably cause an automobile collision with

---

[6] At the time of his Clewiston arrest, Garnto was in violation of the conditions of his work release which required him to be at his mother's house in the evenings and to refrain from the use of alcohol.

15

serious injuries due to his driving while intoxicated. See McClendon, 305 F.3d at 326. We recall that the pertinent collision occurred several months after Garnto's release. See Ruiz v. McDonnell, 299 F.3d 1173, 1183 (10th Cir. 2002) (in state-created danger context stating that "[a]ffirmative conduct for purposes of § 1983 should typically involve conduct that imposes an immediate threat of harm, which by its nature has a limited range and duration"). The release in this case is no constitutional tort.

B.      The use of Garnto as a confidential informant

Neither can we conclude that the decision to utilize Garnto as a confidential informant to make controlled drug purchases was so egregious as to establish a substantive due process violation.[7]

Although Garnto had an extensive criminal history and a history of substance abuse, we cannot say that Defendants' use of Garnto as a confidential informant for controlled buys reflects such indifference to an extremely great risk to the safety of

---

[7] To the extent that Plaintiffs attempt to allege that Lieutenant Sibbald was involved in making Garnto a confidential informant and allowing him to travel to Fort Myers, the record reflects no evidence that Lieutenant Sibbald was involved in the use of confidential informants in any way. Taking the evidence in the light most favorable to the Plaintiffs, the record reflects, at most, that Lieutenant Sibbald was aware that Garnto was acting as a confidential informant.

the public that this decision -- when not viewed in hindsight with the results fully known -- "shocks the conscience." Collins, 112 S.Ct. at 1069-70 (noting that the Due Process Clause was intended to prevent government officials "from abusing [their] power, or employing it as an instrument of oppression").

A government interest is advanced by using confidential informants. Combating unlawful drugs is a legitimate and important government function. Confidential informants can be helpful in this endeavor. Some confidential informants have blemishes on their own records which make them more acceptable to the criminal element on which they are to inform. The government cannot be expected to rely exclusively upon the virtuous in enforcing the law. See United States v. Richardson, 764 F.2d 1514, 1521 (11th Cir. 1985); see also United States v. Simpson, 813 F.2d 1462, 1470 (9th Cir. 1987) ("It is unrealistic to expect law enforcement officers to ferret out criminals without the help of unsavory characters.").

Defendants did not authorize Garnto to perform his duties as a confidential informant while intoxicated. Instead, HCSO policy prohibited confidential informants from conducting drug purchases if they had been ingesting alcoholic beverages. Nothing in the record reflects that Defendants ever utilized Garnto -- or anyone else -- as a confidential informant when he had been drinking or under the

influence of drugs, or that Garnto (before the fatal collision) had ever earlier shown up to perform his confidential informant duties while intoxicated.

Because Defendants' decision to use Garnto as a confidential informant did not present an extremely great risk that Garnto would cause a deadly automobile collision due to his intoxication, this decision does not present such an extraordinary circumstance that shocks the conscience in a way that amounts to a substantive due process violation.  See McClendon, 305 F.3d at 326; Brown v. Commonwealth of Pennsylvania, Dept. of Health Emergency Med. Servs. Training Inst., 318 F.3d 473, 479 (3d Cir. 2003) (concluding that to state a civil rights claim the harm ultimately caused had to be foreseeable and fairly direct).

C.    Trip to Fort Myers

Nothing in the record reflects that Sheriff Lee was aware of or had approved of Garnto's trip to Fort Myers for the Fourth of July weekend.[8]  More important,

---

[8] We doubt that the record supports that Garnto's trip to Fort Myers for the Fourth of July weekend was an HCSO "undercover drug operation." Although HCSO initially recruited Garnto as a confidential informant, as the amounts of cocaine involved in the Sanchez investigation increased, the controlled buys became prohibitively expensive for HCSO. Captain Vetter spoke to Federal DEA Agent Eads about the DEA becoming involved in the investigation. Garnto subsequently signed a confidential informant agreement with the DEA. Garnto was instructed that, if he had information pertaining to Sanchez or Dennis, he needed to call Agent Eads. Although HCSO continued to assist the DEA with the investigation by supplying equipment and personnel, Officer

18

even assuming <u>arguendo</u> that Sheriff Lee implicitly condoned Garnto's trip, such an act was not sufficient to establish a constitutional violation. <u>See</u> <u>Lewis</u>, 118 S.Ct. at 1716 ("[O]nly the most egregious official conduct can be said to be 'arbitrary in the constitutional sense'") (quotation omitted).[9] The record does not reflect that Defendants suggested, or even condoned, the idea that Garnto should drive while intoxicated. Although Garnto had two previous convictions for driving while intoxicated, the convictions had taken place ten years earlier. Neither does the record reflect that Garnto indicated to Agent Eads and Officer Notaro that he, in the group involved, would be the person driving to or around Fort Myers. The record actually reflects that Garnto traveled to Fort Myers in a car that belonged to one of his companions. A fatal automobile collision caused by Garnto's drinking and driving was not an extremely great risk in deciding to allow Garnto, with

_____

Notaro -- because Garnto was the DEA's informant for Sanchez and Dennis -- no longer listed his meetings with Garnto on his contact sheets. Furthermore, although Officer Notaro indicated to Agent Eads that Notaro was willing to assist at Fort Myers Beach if necessary, Officer Notaro also stated that he would have to get approval from his supervisor. Garnto, however, never contacted Agent Eads. Still, we need not decide this whose-informant-was-whose issue. Even if the weekend was an HCSO "undercover drug operation" the fatal car collision caused by Garnto's driving while intoxicated was not a harm that was an extremely great risk when the decision was made to allow Garnto to go to Fort Myers.

[9] Plaintiffs also argue at length that Garnto was an agent for HCSO at the time of the accident. Garnto is not a defendant. Plaintiffs acknowledge that in section 1983 actions, liability must be based on something more than a theory of respondeat superior. <u>See</u> <u>Braddy v. Florida Dep't of Labor and Employment Sec.</u>, 133 F.3d 797, 801 (11th Cir. 1998) (supervisor liability); <u>Cuesta v. School Bd. of Miami-Dade County, Fla.</u>, 285 F.3d 962, 966 (11th Cir. 2002)(municipal liability).

others, to travel to Fort Myers Beach for the weekend: Defendants did not violate the Federal Constitution when the decision was made. McClendon, 305 F.3d at 326; Brown, 318 F.3d at 479. Plaintiffs failed to demonstrate that this conduct was so conscious shocking that it violated the Constitution.

In summary, we, in circumstances such as these, are unwilling to expand constitutional law to hold police departments responsible for the tortious acts of their confidential informants. No decision by Defendants in this case involved such an obviously extremely great risk that Garnto would become intoxicated and then drive an automobile and then crash into another automobile causing serious injury as to shock the conscience. We conclude that the district court properly determined that Plaintiffs failed to establish a substantive due process violation.[10]

Appeal No. 01-16032

Plaintiffs contend that the district court abused its discretion by denying their motion for relief from judgment in the light of the newly discovered evidence and proof of fraud upon the court.

---

[10] We express no view about whether these Defendants are liable to Plaintiffs under Florida law.

20

We review the district court's order denying relief under Rule 60(b) for abuse of discretion. See Am. Banker Ins. Co. of Fla. v. Northwestern Nat'l Ins. Co., 198 F.3d 1332, 1338 (11th Cir. 1999).

For the court to grant relief based upon newly discovered evidence under Rule 60(b)(2), a movant must meet a five-part test: (1) the evidence must be newly discovered since the trial; (2) due diligence on the part of the movant to discover the new evidence must be shown; (3) the evidence must not be merely cumulative or impeaching; (4) the evidence must be material; and (5) the evidence must be such that a new trial would probably produce a new result. Toole v. Baxter Healthcare Corp., 235 F.3d 1307, 1316 (11th Cir. 2000). "A motion for a new trial under Rule 60(b)(2) is an extraordinary motion and the requirements of the rule must be strictly met." Id. Finality is a virtue in the law.[11]

To obtain relief from a final judgment based upon fraud under Rule 60(b)(3), the moving party must prove by clear and convincing evidence that the adverse party obtained the verdict through fraud, misrepresentations, or other misconduct. See Frederick v. Kirby Tankships, Inc., 205 F.3d 1277, 1287 (11th Cir. 2000). The

---

[11] Expedit reipublicæ ut sit finus litium: It is for the public good that there be an end of litigation. S.S. Peloubet, A Collection of Legal Maxims in Law and Equity 77 (1985).

moving party must also demonstrate that the conduct prevented them from fully presenting his case. See id.

In support of their Rule 60(b) motion, Plaintiffs submitted (1) proffered testimony from Garnto that Agent Eads had provided him $200 "drinking money" for the weekend; (2) an affidavit from Ralph Cunningham, the Chief Investigator for the Office of the State Attorney for the Twentieth Circuit of Florida, stating that Garnto was being used as a confidential informant by both HCSO and the DEA as part of a joint drug task force and that HCSO had a financial stake in any forfeited assets that resulted from the task force operation; (3) a memo from an HCSO corporal, David Harrison, stating that he had withheld information from the victims' investigator; and the (4) depositions of Agents Eads and Magno revealing the "full scope" of the arrangement between HCSO, DEA, and the Fort Myers Police Department.

We first consider Garnto's testimony, which was given at Garnto's criminal trial after the district court had granted summary judgment in this civil case. Even assuming that Garnto's testimony is "newly discovered," we conclude that Plaintiffs failed to demonstrate due diligence in obtaining the substance of this information. After the collision, an investigator for Plaintiffs obtained a statement from Garnto; they submitted the statement to the district court before summary

judgment was granted. It was when Defendants later attempted to depose Garnto, that Garnto invoked his Fifth Amendment rights.[12] Before summary judgment was granted, it was only Defendants who were complaining about insufficient information from Garnto.

At a time when Defendant's motion for summary judgment was pending and a trial in this case was looming in the future, Defendants moved to strike Garnto from Plaintiffs' witness list on the grounds that Defendants had no opportunity to depose Garnto. Plaintiffs opposed the motion pointing out that Defendants -- and Plaintiffs -- had access to other statements Garnto provided to the police after the accident. In district court, Plaintiffs noted that Defendants could seek an extension of the discovery cutoff or a stay of the civil proceedings pending the resolution of the criminal charges against Garnto if Defendants felt the statements Defendants had were not enough.[13] Plaintiffs never sought to stay the summary judgment

_____

[12] At the time Defendants sought to depose Garnto he was facing criminal charges arising from the collision at issue in this case. Garnto was tried on the criminal charges in April 2000, after the district court granted summary judgment in this case. At his criminal trial, Garnto testified that Federal Agent Eads gave him money to finance the trip. By the way, Agent Eads denies that he gave Garnto "drinking money."

[13] That Plaintiffs, when a summary judgment motion was pending, acknowledged that Garnto had a criminal trial in prospect at which new information might be revealed seems worth mentioning. Plaintiffs' knowing about this possibility of more information, and not themselves moving per Rule 56(f) or otherwise to stay a decision on summary judgment until Garnto's trial was at an end, is basically the same as Plaintiffs saying to the district court, as it considered the summary judgment motion, that Plaintiffs "would play these cards," that is, were willing to stand or fall on what they already had.

23

proceeding. Before summary judgment was granted, Plaintiffs never indicated dissatisfaction with the information they had in hand from Garnto.

In this context, Plaintiffs have no right to relief from the district court's entry of summary judgment based upon this "newly discovered" evidence. Before the entry of summary judgment, Plaintiffs could have sought to depose Garnto, or, in the alternative, request a continuance pursuant to Fed.R.Civ.P. 56(f), until after Garnto's criminal trial. Plaintiffs instead chose to rely upon the statement obtained by their investigator. They cannot now persuasively complain that Garnto had additional evidence of which they were unaware and which might have helped them to avoid summary judgment. See Karak v. Bursaw Oil Corp., 288 F.3d 15, 20 (1st Cir. 2002) (concluding that Plaintiff not entitled to relief under Fed.R.Civ.P. 60(b)(2), where Plaintiff knew of witness and chose not to seek extension for discovery or further investigation); see also Parrilla-Lopez v. United States, 841 F.2d 16, 19-20 (1st Cir. 1988)(concluding that deposition testimony was not "new evidence" where plaintiff decided not to depose witness due to expense). Neither did the district court abuse its discretion by denying relief under Fed.R.Civ.P. 60(b)(3). It was Plaintiffs' tactical decisions, not fraud by Defendants, that

prevented Plaintiffs from fully presenting their case.  See Taylor v. Texgas Corp., 831 F.2d 255, 259-260 (11th Cir. 1987).[14]

The remainder of Plaintiffs' "newly discovered" evidence, including the affidavit of Ralph Cunningham, the depositions of Agents Eads and Magno, and the Harrison memorandum, is not evidence that would change the outcome of the case.  See Toole, 235 F.3d at 1316.  This evidence seems pertinent only to whether Garnto was a county or federal confidential informant at the pertinent time.  Plaintiffs also have failed to demonstrate why they could not have obtained this information before the entry of summary judgment.

We conclude that the district court did not abuse its discretion by denying Plaintiffs' motion for relief under Fed.R.Civ.P. 60(b)(2) & (3).

CONCLUSION

The district court properly granted Defendants summary judgment, concluding that Plaintiffs' claims do not amount to a constitutional violation.

---

[14] By concluding that Plaintiffs have failed to demonstrate due diligence, we do not imply that this evidence would have changed the outcome of this case.  We doubt that it would.  But we need not decide this issue.

Furthermore, the district court properly exercised its discretion by denying

Plaintiff's motion for relief under Rule 60(b).

AFFIRMED.